FILED

2024 Sep-03  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ERIN BLACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:22-cv-00545-JHE |
| | ) | |
| FIVE GUYS OPERATIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Erin Black ("Black") brings this employment discrimination action against her former employer, Five Guys Operations, LLC ("Five Guys").  (Doc. 1).  Five Guys has moved for summary judgment on Black's claims against it.  (Doc. 34).  Black opposes the motion.  (Doc. 43). The motion is fully briefed.  (Docs. 38, 43-1 & 45).  For the reasons discussed further below, Five Guys' motion is **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 11).

party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276–78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts[2]

Five Guys is a fast-casual restaurant chain selling, *inter alia*, hamburgers, hot dogs, and French fries.  (Declaration of Wendy Carrasquillo Greene, ("Greene Decl.," doc. 35-5) at ¶ 4).[3]  A Five Guys store employs various crew members including Shift Leaders, Assistant Managers, and General Managers ("GMs").  (*Id.* at ¶ 5).  Assistant Managers report to GMs, GMs report to District Managers ("DMs"), and DMs report to a Director of Operations.  (*Id.* at ¶¶ 6–7).

### A. Five Guys' Policies

Five Guys has a variety of policies relevant to this case.  First, it has equal employment, anti-harassment, and non-discrimination policies.  (Deposition of Erin Black ("Black Depo.," doc. 43-1) at 95–96 (Exh. 2); Greene Decl. at ¶ 8).  Five Guys provides anti-discrimination and harassment training and maintains regional human resources ("HR") representatives who are available to employees.  (Greene Decl. at ¶ 9).  Employees with questions or concerns about discrimination are encouraged to contact their immediate supervisor or an HR member and are to notify either if they believe they have been a victim of such conduct.  (Black Depo. at 95–96 (Exh. 2).  Five Guys provides a hotline for such reports as well.  (*Id.*).  Five Guys also has an anti-retaliation policy covering employees who raise concerns and make reports.  (*Id.*).

Second, Five Guys has a "zero tolerance" Workplace Violence Prevention Policy.  (Black Depo. at 97 (Exh. 3)).  The policy provides that "acts of violence, threats, intimidation or implied threats of violence will not be tolerated and will be promptly investigated."  (*Id.*).  The policy

---

[2] Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party. Factual disputes are addressed in footnote form.

[3] As discussed further below, Wendy Carrasquillo Greene is an Organizational Development Partner with Five Guys who investigated the incidents at issue in this case.

further states that "[a]ny violation . . . may lead to disciplinary action, up to, and including termination, as well as intervention by local law enforcement." (*Id.*).

New employees receive a copy of Five Guys' Employee Handbook (the "Handbook"), which contains the procedures and policies discussed above. (Greene Decl. at ¶ 10).

### B. Black's Work with Five Guys

Five Guys hired Black, who is female, on May 20, 2020. (Black Depo. at 11 (35:10–11)). When Black was hired, she signed an Acknowledgement of Receipt form indicating that she had received the Handbook. (Black Depo. at 15 (51:9–18), 94 (Exh. 1)). Black testified that she never read the Handbook or the Sexual Harassment Policy and never received training on how to report sexual harassment to Five Guys. (Declaration of Erin M. Black ("Black Decl.," doc. 44-2) at ¶ 3).

During her employment with Five Guys, Black worked at the Brookwood Mall location in Homewood, Alabama (Store 193). (Black Depo. at 11 (35:10–11)). Black generally worked the night/closing shift. (*Id.* (36:13–22); Declaration of Terry McDaniel ("McDaniel Decl.," doc. 35-7) at ¶ 3). Terry McDaniel ("McDaniel") was the GM at Store 193, and Christopher Hicks ("Hicks") was the DM. (Deposition of Wendy Greene ("Greene Depo.," doc. 35-2) at 11 (39:22–40:5, 40:18–21)).

One of Black's fellow crew members was Joshua Rhodes ("Rhodes"). Rhodes had previously been convicted of sexual battery of a female under sixteen; consequently, he was a registered sex offender. (Doc. 44-3 at 2). Five Guys does not conduct background checks on hourly crew members, and none of the managers at Store 193 were aware of Rhodes' status as a

sex offender.[4]   (Greene Depo. at 14 (49:2–10); Deposition of Christopher Hicks ("Hicks Depo.,"

doc. 35-3) at 12 (43:23–44:7); McDaniel Decl. at ¶ 9; Deposition of Ryan Hogue ("Hogue Depo.,"

doc. 35-4) at 11–12 (40:21–41:6)).   Rhodes' application for employment with Five Guys leaves

blank the fields for previous employment and references.  (Hogue Depo. at 34 (Exh. 9)).

### C. March 24 Incident

#### 1. Incident

On March 24, 2021, Black and Rhodes were working the night shift with assistant manager

Ryan Hogue ("Hogue").  (Black Decl. at ¶ 4; Hogue Depo. at 15 (55:5–13)).  Sometime after 10:00

p.m., Rhodes and Black got into an altercation over Rhodes' refusal to take out the trash.  (Black

Depo. at 30 (114:18–115:2); Greene Depo. at 13 (46:7–18); Greene Decl. at ¶ 14–15).  Because

Rhodes would not do so, Black took Rhodes' tips and put them in her bra.  (Id.).  Rhodes physically

attempted to get his tips back by trying to put his hand down Black's shirt.  (Id.).  During the

scuffle, Rhodes touched Black's clothed breast, but Black stopped him from going further. [5]  (Id.).

---

[4] In her response, Black states that "there was testimony that management was aware of
rumors and jokes concerning the conviction and that Rhodes would get upset when crew members
would talk or laugh about it. But management never bothered to investigate the conviction." (Doc.
43-1) (citing Hogue Depo. at 12 (41–42)).  Black mischaracterizes this testimony.  Questioned
about in-store discussions of Rhodes' conviction, Hogue testified: "People would say something
about [Rhodes'] past, but I never heard anything to the effect that he was a convicted felon."
(Hogue Depo. at 12 (41:15–20)).  When Black's counsel asked Hogue to clarify what people said,
Hogue testified: "That's really all.  You know, just like he had a past and, you know, he would get
upset if people were taking about his past . . . . I can't recall.  I just remember crew -- just kind of
in my head, I can -- that's all I can really remember." (Id. (41:23–42:13)).  In other words, Hogue's
testimony was that management were aware of rumors and jokes concerning Rhodes' past as a
general matter; this does not support the inference that they were aware of Rhodes' conviction or
sex offender status.

[5] Five Guys argues in its reply brief that the portion of Black's declaration indicating that
Rhodes "sexually assaulted [Black] by sticking his hands down [her] shirt and touching [her]
breast" (Black Decl. at ¶ 5) should be disregarded because it is contradicted by her deposition

No one else witnessed the incident, which occurred in the restaurant's back office.[6]   (Greene Decl. at ¶ 16).

Following the incident, Black texted both McDaniel and Hogue.  (Black Depo. at 21 (77:9–15)).  Black's message to McDaniel, sent at 11:06 p.m., stated: "Terry I don't feel comfortable working [sic] Josh anymore."  (Doc. 35-1 at 100 (Black Depo. Exh. 5)).  Black sent a similar message to Hogue at 11:15 p.m., stating: "I don't feel comfortable working with Josh anymore. He's out of hand at this point."  (*Id.* at 101 (Black Depo. Exh. 6)).  Neither message mentioned the substance of the altercation.[7]

### 2. Management Response

Black met with McDaniel to discuss her text on March 30, 2021, the next day both worked together.  (Black Depo. at 22 (78:21–79:2)).  Black informed McDaniel that Rhodes had made a

_____

testimony.  (Doc. 45 at 3–5).  Five Guys specifically refers to a portion of Black's deposition testimony that Rhodes was unsuccessful at sticking his hands down Black's shirt during the March 24 Incident.  (*Id.*) (quoting Black Depo. at 36–37 (137:138:15)).  Black's testimony is not the clearest, but some of that appears to come from the distinction Five Guys' attorney attempted to draw when questioning Black between her clothed breast versus her unclothed breast.  (*See generally* Black Depo. at 36–37 (137:138:15)).  For summary judgment purposes, the undersigned assumes a jury could credit the portions of her testimony that support that Rhodes touched her clothed breast.

[6] Black states that she "seemed angry or upset after this incident" (doc. 43-1 at 4), but the testimony she references refers to the March 30 Incident, discussed below.  (*See* Hogue Depo. at 14 (52:4–5)).

[7] Black states in her declaration that she "immediately texted [her] General Manager Terry McDaniel and reported the incident . . . [but] McDaniel did not investigate [her] complaint of sexual assault or report [her] complaint to Human Resources at company headquarters as required by Five Guys Policies."  (Black Decl. at ¶ 5).  Black's text messages are part of the summary judgment record, and neither is a "complaint of sexual assault."  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).  The undersigned thus does not consider as a summary judgment fact any claim that Black directly reported sexual assault with these text messages.

comment about her jeans and that she no longer wanted to work with Rhodes. (McDaniel Decl. at ¶ 6; Greene Depo. at 16 (58:17–59:1)). However, Black did not provide McDaniel with details concerning the March 24 Incident; specifically, she did not mention anything sexual in nature or indicate that Rhodes had touched her inappropriately. (McDaniel Decl. at ¶¶ 7–8; Greene Depo. at 16 (58:17–59:1)). McDaniel also met with Rhodes, who was also working that day; Rhodes denied making any comments to Black. (McDaniel Decl. at ¶ 10). Based on these interviews, McDaniel concluded that the March 24 Incident resulted from personal animosity between Rhodes and Black due to "Black giving Rhodes a hard time and questioning Rhodes' work ethic." (*Id.* at ¶ 11).

In addition to Black's request that she not be scheduled to work with Rhodes, Rhodes requested to McDaniel during his interview that he be moved to day shift. (McDaniel Decl. at ¶ 12). Because Five Guys makes its schedules in advance, McDaniel informed Black and Rhodes that the following week (i.e., the week of April 5, 2021) they would no longer work the same shift; Black would continue on night shift, and Rhodes would be moved to day shift. (*Id.* at ¶ 13; Black Depo. at 23 (82:11–83:6)).

### D. March 30 Incident

#### 1. Incident

Black and Rhodes worked the March 30 night shift together following their meetings with McDaniel. Sometime that evening, Black told Rhodes to change the trash. (Black Depo. at 24 (86:20–23)). Rhodes refused. (Black Depo. at 26–27 (97:18–98:18); doc. 35-2 at 118–20 (Greene Depo. Exh. 19)). Although she had no authority to do so, Black walked to the register in the front of the store to clock Rhodes out. (Black Depo. at 24 (87:9–11), 26–27 (97:18–98:18)). Rhodes

followed Black and groped her breasts from behind.[8]  (Black Depo. at 27 (98:19–99:3)).  Because

she felt unsafe, Black picked up a pair of scissors next to the register, informing Rhodes that she

would stab him if he did not let her go.  (*Id.* (100:12–101:10)).  Shortly after this, Rhodes let go.

(*Id.* (101:17–18)).

No other Five Guys employee directly witnessed the confrontation.  Hogue (who was also

working that shift) had heard Black tell Rhodes to change the trash. (Hogue Depo. at 16 (46:3–6)).

He also heard Black yelling and Rhodes saying "no, don't clock me out."  (*Id.* at 13 (48:2–20)).

When Hogue went to the front of the restaurant to deescalate the situation, he found Black and

Rhodes standing next to each other.  (*Id.*).  Hogue told Rhodes to clock out and leave.  (*Id.*).

Black also left immediately after the incident.  (Black Depo. at 28 (102:9–12)).  When she

got to her car, she texted McDaniel.  (*Id.*).  Her text stated:

> Joshua just touched me.  I can't work with him tomorrow.  I asked him to change
> the trash and he refused.  I pushed the trash can near him and he said he wasn't
> doing it.  So I went to clock him out.  He grabbed me from behind.  I picked up the
> scissors and told him if he didn't let me go that I was going to stab him.  I left my
> stuff at the store.  So, I'll be there in the morning.

(McDaniel Decl. at 8).

### 2. Management Response

McDaniel reported the altercation to DM Hicks.  (McDaniel Decl. at ¶ 15).  Five Guys HR

then initiated an investigation into the incident.  (Hicks Depo. at 12 (44:22–23); Greene Decl. at

---

[8] Five Guys contends Black's testimony is inconsistent as to whether Rhodes touched her
breasts or "under" her breasts.  (Doc. 45 at 4–5).  As with Five Guys' characterization of the March
24 Incident (*see supra*, n.5), the two formulations are not inherently self-contradictory; a jury could
easily conclude that any conflict between them is trivial.

¶ 11)).  Black and Rhodes were both suspended pending the outcome of the investigation.  (Black Depo. at 29 (107:18–21); Greene Decl. at 8).

Five Guys assigned Organization Development Partner Wendy Carrasquillo Greene ("Greene") to investigate the incident.  (Greene Decl. at ¶ 11).  Greene interviewed McDaniel, Hogue, and Black and reviewed video footage.[9]  (Greene Decl. at ¶ 12).

Greene interviewed Black on March 31, 2021.  (Greene Decl. at 8–9).  During the interview, Black described the March 24 Incident.  (Black Depo. at 30–31 (112:23–114:17); Greene Depo. at 13 (46:7–18); Greene Decl. at ¶ 15).  Unlike her texts to McDaniel and Hogue or her March 30, 2021 interview with McDaniel, Black disclosed to Greene that Rhodes had "tried getting his tips from her bra," prompting her texts that she was not comfortable working with Rhodes. (Greene Decl. at 9).  Black also described the March 30 Incident in substantially the same terms detailed above.  (*Id.* at 8–9).

Greene interviewed McDaniel on March 31, 2021, and again April 1, 2021.  (Greene Decl. at ¶ 18; Greene Decl. at 8–9).  McDaniel denied that Black had provided any details of the March 24 Incident to him or informed him that Rhodes had touched her inappropriately.  (*Id.*).

Greene also viewed security camera footage of both incidents.[10]  In her declaration, she characterized the video of the March 24 Incident as showing "Rhodes and Black engaging in a

---

[9] Greene attempted to interview Rhodes, but he did not return any phone calls or messages. (Greene Depo. at 22 (83:23–84:4); Greene Decl. at ¶ 13)).

[10] Five Guys has provided this footage—or, rather, what appears to be cellphone recordings of security camera footage as displayed on a computer.  (*See* doc. 36).  The footage itself is blurry, and its framerate is so low that very little can be discerned about any of the incidents.  Because none of these videos could aid a jury in discerning what happened, the undersigned has largely disregarded them as evidence of what did or did not occur during either incident.  *See Prosper v. Martin*, 989 F.3d 1242, 1252–53 (11th Cir. 2021) ("A blurry video that does not depict much of

9

discussion in the back office" but not showing "Rhodes touching Black in any manner." (Greene Decl. at ¶ 24). Greene testified that the video of the March 30 Incident "shows both Rhodes and Black arguing, Rhodes attempting to pull Black away from the register, and Black grabbing a pair of scissors and holding the scissors over her head towards Rhodes." (*Id.* at ¶ 25). Greene found neither video supported that Rhodes "touched Black's breasts or otherwise touched her in a sexually inappropriate manner on either occasion." (*Id.* at ¶ 26).

Greene concluded based on her investigation that Black's claims of sexual harassment by Rhodes "could not be substantiated." (Greene Depo. at 40 (153:3–13), 84; Greene Decl. at ¶ 28). However, Greene found that Rhodes had violated Five Guys' Workplace Violence Prevention Policy by "attempting to pull Black away from the register" and that Black had violated the policy based on her acknowledgement that she "threaten[ed] Rhodes with a weapon in her hand." (Greene Depo. at 40 (153:3–13), 84 (Exh. 8); Greene Decl. at ¶ 29–30).

Greene reported her findings to Five Guys' Southeast Organizational Development Partner Debra Blackmon. (Greene Decl. at ¶ 31). Together, Greene and Blackmon recommended to Hicks that both Black and Rhodes be terminated for violating the Workplace Violence Prevention Policy—Black for threatening Rhodes with the scissors, and Rhodes for attempting to pull Black away from the register.[11] (*Id.* at ¶ 31; Greene Depo. at 121 (Exh. 20)). Based on the findings and

anything cannot give rise to issues of fact about what did or did not happen on a particular occasion."). That said, the undersigned discusses the videos further below in the context of how Greene may have perceived them.

[11] Greene and Blackmon also recommended that McDaniel receive "verbal coaching" for failing to report that Black felt uncomfortable with Rhodes after the March 24 Incident, observing that the March 30 Incident "could have escalated to violence rather quickly [and] could have been easily avoided had Terry followed policy." (Greene Depo. at 40 (153:3–19), 84 (Exh. 8); Greene Decl. at ¶ 32). Greene explained that "it's not uncommon for employees to state that they feel

recommendation, Hicks terminated both Rhodes and Black effective April 5, 2021.  (Hicks Depo. at 8 (26:20–27:4)).

### III. Analysis

Black's complaint asserts six claims: (1) Count I, a Title VII sexual harassment claim (doc. 1 at ¶¶ 13–20; (2) Count II, a Title VII sexually hostile work environment claim (*id.* at ¶¶ 21–26); (3) Count III, a Title VII Retaliation claim (*id.* at ¶¶ 27–34); (4) Count IV, an Alabama state law intentional infliction of emotional distress ("IIED") claim (*id.* at ¶¶ 35–38); (5) Count V, an Alabama state law negligent/malicious retention, supervising, and training claim (*id.* at ¶¶ 39–44); and (6) Count VI, an Alabama state law invasion of privacy claim (*id.* at ¶¶ 45–48).[12]

At Black's deposition, her counsel explicitly abandoned Count VI.  (Black Depo. at 44 (168:20–169:4)).  Therefore, that claim is due to be dismissed.  The remaining five counts are discussed below.

#### A. Title VII Claims

When a plaintiff bases disparate treatment claims (like the ones here) on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).  Under the *McDonnell Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment

---

uncomfortable when there's simply a conflict between them . . . [the word] 'uncomfortable' . . . doesn't always imply that they're being sexually harassed or that there's been an egregious violation of policy."  (Greene Depo. at 41 (157:2–14)).

[12] Black separately numbers her Title VII counts and her state law counts (i.e., there is one Title VII Count I and a separate state law Count I).  For clarity, the undersigned has renumbered the counts so that each has a distinct number.

action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted).  To demonstrate the fourth element of the disparate treatment *prima facie* case, a plaintiff must ordinarily point to comparators who are "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1226.  In *Lewis*, the Eleventh Circuit provided a non-exhaustive list of the types of similarities that would "underlie a valid comparison": whether the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) was "subject to the same employment policy, guideline, or rule as the plaintiff"; (3) was "ordinarily (although not invariably) . . . under the jurisdiction of the same supervisor as the plaintiff"; and (4) "share[d] the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).  "The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford*, 529 F.3d at 976.  A pretextual reason is not only one that is false but one that conceals

an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

### 1. Counts I and II – Sexual Harassment/Hostile Work Environment[13]

An employee seeking to establish a *prima facie* hostile work environment case must demonstrate that: "(1) [s]he belongs to a protected group; (2) [s]he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as [sex]; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020) (citing *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)).

Five Guys does not dispute that Black belongs to a protected group or that she suffered unwelcome harassment. (*See* doc. 38 at 16–21). However, it contests the third, fourth, and fifth elements of the *prima facie* case: that Rhodes' conduct was based on Black's sex (*id.* at 17–18), that Black can show severe or pervasive harassment (*id.* at 16–19) and that there is a basis to hold Five Guys liable for Rhodes' actions (*id.* at 19–21). The undersigned discusses each of those in turn below.

### a. Harassment Based on Sex

Five Guys contends there is no evidence to support that Rhodes' actions were based on Black's sex because "there is no evidence that Rhodes grabbed Black in a sexually inappropriate

---

[13] There does not appear to be any discernable difference between these two theories as pleaded or argued in this case.

manner." (Doc. 38 at 17–18). To illustrate this, Five Guys relies on the inception of the two arguments between Black and Rhodes: (1) for the March 24 Incident, that Black had taken Rhodes' tips and hidden them in her bra due to her belief that Rhodes was not working hard enough; and (2) for the March 30 Incident, that Rhodes would not take the trash out so Black attempted to clock him out for the night. (*Id.* at 17–18). It would certainly be permissible for a jury to conclude that Rhodes' physical contact with Black was incidental: that he was trying to get his tips back during the March 24 Incident and that he was trying to prevent Black from clocking him out during the March 30 Incident. That said, regardless of how the incidents *started*, a jury could reasonably conclude that the incidents had a sexual component because they culminated in Rhodes touching Black's breasts. The court does not weigh the persuasiveness of these two permissible conclusions at summary judgment. Thus, there is sufficient evidence to support that Rhodes' conduct was based on Black's sex.

### b. Severe and Pervasive Harassment

To meet the fourth element of a hostile work environment claim, a plaintiff must point to evidence showing that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). This contains both a subjective and an objective element. *Fernandez*, 961 F.3d at 1153. The employee must first establish that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21. As to the objective element, she must show that the environment is one "that a reasonable person would find hostile or abusive." *Id.* A court assessing the objective element must consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a

14

mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999). These factors guide the inquiry, but the evidence must be viewed "cumulatively and in the totality of the circumstances." *Fernandez*, 961 F.3d at 1153 (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010)).

Five Guys does not dispute that Black subjectively perceived Rhodes' conduct to be abusive (*see* doc. 38 at 17–19), so the only question is whether Black has satisfied the objective prong of the inquiry under the *Mendoza* factors. As to the frequency of the conduct, there is no dispute that the conduct at issue consists only of the March 24 Incident and the March 30 Incident. Black began working for Five Guys on May 20, 2020. In other words, Black's hostile work environment claim consists of two incidents over an eight-month period of employment, concentrated in a six-day window. This is not particularly frequent, and Black makes no argument to the contrary. The second and third factors blur together somewhat in this case because the only instances of harassment involve physical contact. Viewing the facts in the light most favorable to Black, the conduct involved brief physical contact with Black's breasts. Without minimizing Rhodes' conduct, courts have generally not found this type of brief contact to be severe without accompanied by more. *See, e.g., Mendoza*, 195 F.3d at 1247–48 (conduct including a supervisor rubbing his hip against the plaintiff's hip while touching her shoulder not sufficiently severe or pervasive); *Mitchell v. Pope*, 189 F. App'x 911, 913 (11th Cir. 2006) (no hostile work environment claim when harasser touched or attempted to touch the plaintiff three times: "when he tried to kiss her, when he lifted her over his head, and when he rubbed up against her and reached across her chest"); *Evans v. Mobile Infirmary Med. Ctr.*, No. CIV.A.04–0364-BH-C, 2005 WL 1840235, at *9 (S.D. Ala. Aug. 2, 2005) (conduct including the alleged harasser "grabb[ing the plaintiff's]

bottom/butt on two occasions and touch[ing] her breast on one occasion" not sufficiently severe or pervasive). *See also Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 422 (11th Cir. 1999) (finding actionable hostile work environment claim when the plaintiff was subjected to "a continuous barrage of sexual harassment" including numerous incidents where the harassers made sexually suggestive comments, "grabbed or slapped [the plaintiff's] buttocks, groped her leg, or otherwise touched her in a sexually suggestive manner.").  Finally, as to the fourth factor, there is minimal evidence to support that Rhodes' conduct interfered with Black's performance of her ordinary job duties.  The March 24 Incident occurred when Black took tips that belonged to Rhodes and placed them inside her bra.  The March 30 Incident occurred when Black attempted to clock Rhodes out.  To the extent that Rhodes' conduct on those two occasions affected Black's job performance, it was by interfering with tasks that were wholly outside the scope of Black's authority as a crew member.  That said, Black's request that she not work the same shift as Rhodes based on the March 24 Incident is some evidence that Rhodes' conduct affected her ability to perform her duties as a crew member.

Taken together, the *Mendoza* factors do not suggest the harassment Black suffered was sufficiently severe or pervasive that it altered the terms and conditions of her employment.  Nor is there anything apart from those factors that would nudge Rhodes' conduct into actionability.  The undersigned notes that Black does not attempt to address the *Mendoza* factors at all beyond reciting them, nor does she make any other argument to support the objective prong of the hostile work environment inquiry.  (*See* doc. 43-1 at 17–18).  Black has simply not made out this element of her *prima facie* case.

**c. Basis for Liability**

Regardless of whether Black suffered severe and pervasive harassment, she cannot make out a *prima facie* hostile work environment case because the evidence also does not support a basis to hold Five Guys liable for Rhodes' conduct.  "Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action."  *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000).  For liability to attach, a plaintiff must show either (1) that the employer had actual knowledge of the perpetrator's actions or (2) that the conduct was sufficiently severe and pervasive that the employer can be charged with constructive knowledge. *Id*.

Black indirectly argues that Five Guys should be charged with constructive knowledge of Rhodes' actions because of its failure to perform a background check on Rhodes.  (Doc. 43-1 at 7).  Black points to nothing in the text of Title VII or any other law that requires a background check for an unskilled food service position.[14]  Nor does Five Guys' own policy require this.  Additionally, even if there were evidence to support that the management of Store 193 knew or should have known that Rhodes was a sex offender, Black provides nothing to indicate that an employer should be charged with constructive knowledge that an employee has engaged in harassing conduct *solely* because of the employee's sex offender status.[15]  The undersigned has

---

[14] Black suggests that "a simple Google search would have revealed [Rhodes'] conviction" (doc. 43-1 at 3, 15), but Black has not established that an employer is obligated to do a Google search before hiring an employee either.

[15] There is nothing in the record that indicates the nature of Rhodes' offense beyond the charge.  Black appears to contend without any apparent basis that a sex offender designation should put an employer on notice of *any* form of sexual harassment, whether or not it is connected with or similar to the offense of conviction.

independently located no authority that would support either argument.  Black cannot rely on the

lack of a background check to establish Five Guys' constructive knowledge of Rhodes' conduct.

As for actual notice, the entirety of Black's actual notice argument is that Five Guys "failed

to take any action to protect [Black] after the first sexual assault."  (Doc. 43-1 at 17).  In other

words, Black centers the basis for Five Guys' liability on the March 24 Incident and its aftermath.

Even viewed favorably to Black, the record does not reflect that Five Guys ever knew (or should

have known) that the March 24 Incident had a sexual component, or was anything more than an

argument between two employees, until the March 30 Incident had already occurred.  In multiple

parts in her brief, Black contends she reported the March 24 Incident to Five Guys management

as "sexual assault." (*See, e.g.,* doc. 43-1 at 4–5, 7–8).  Leaving aside that Black's characterization

borders on a legal conclusion, the record supports that Black reported an altercation between

herself and Rhodes—not that Black reported that the altercation involved "sexual assault."  Black's

texts to Hogue and McDaniel did not state or imply that Rhodes had sexually assaulted her, that

Rhodes had touched her inappropriately, or that physical contact of any sort had occurred between

the two employees.  Faced with a generic complaint that Black did not "feel comfortable" working

with Rhodes, no reasonable employer would have believed Black to be reporting sex-based

harassment rather than simply a general conflict between herself and Rhodes.  Furthermore, Black

did not shed any light on the matter during her March 30 interview with McDaniel such that

McDaniel was on notice at that point.[16]  Black again did not report that Rhodes had made any

physical contact with her or provide any other information that could lead a manager to conclude

---

[16] Black does not dispute Five Guys' characterization of her texts or her verbal reports to
McDaniel on March 30.  (*See* doc. 43-1 at 4–5).

that Rhodes had sexually harassed her.[17]  To the extent Black argues that McDaniel failed to investigate Black's complaints (*see* doc. 43-1 at 5), the record does not reflect that he had any reason grounded in Title VII to do so.  Accordingly, Black's first and second counts are due to be dismissed.

### 2. Count III – Retaliation

Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she 'has opposed any practice made an unlawful employment practice by this subchapter.'"  *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005) (citing 42 U.S.C. § 2000e–3(a)).  To make out a *prima facie* case of retaliation, a plaintiff must show that "(1) [s]he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was some causal relation between the two events."  *Worley v. City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001)).

To show protected activity under the Opposition Clause, a plaintiff must demonstrate "that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This contains both a subjective and an objective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and

---

[17] Even if Five Guys management had known about Rhodes' status as a sex offender, it is not reasonable to infer from that knowledge that management should have interpreted Black's March 24 report that she did not "feel comfortable" around Rhodes as a report that Rhodes sexually assaulted Black.

bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*  An employee alleging she engaged in protected activity must "at the very least, communicate her belief that discrimination is occurring to the employer and cannot rely on the employer to infer that discrimination has occurred."  *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (citing *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998) (internal quotation marks omitted).  A retaliation plaintiff must show that the "protected activity was a but-for cause of the alleged adverse action by the employer."  *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013).

As discussed above, Black's March 24, 2021, texts did not communicate to Five Guys that Rhodes had sexually harassed her.  Therefore, regardless of Black's subjective beliefs concerning Rhodes' conduct (*see* doc. 43-1 at 19), those texts are not statutorily protected expression.  However, Black undisputedly communicated her beliefs that Rhodes' actions on March 30, 2021, were sexual harassment through her statements to Greene during the investigation.  Five Guys does not appear to dispute in its motion that this is protected activity, nor does it dispute the other elements of Black's *prima facie* case as it pertains to Black's reports.[18]  Instead, with the burden shifted back to it, Five Guys relies on its legitimate, nonretaliatory reason for terminating Black:

---

[18] Five Guys does call Black's *prima facie* case into question in a footnote in its reply brief.  (Doc. 45 at 13–14 n.4).  "In general, a court should not consider arguments raised for the first time in a reply brief."  *Reliance Ins. Co. of Illinois v. Richfield Hosp. Servs., Inc.*, 92 F. Supp. 2d 1329, 1332 (N.D. Ga. 2000).  In any case, it is clear that Black's termination was an adverse employment action, and, as Black points out (doc. 43-1 at 20), the close temporal proximity (a matter of days) is sufficient at the *prima facie* case stage to show a causal connection.  *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798–99 (11th Cir. 2000).

her violation of its Workplace Violence Policy.  (Doc. 38 at 23–24).  This shifts the burden back to Black to show pretext.

She cannot.  Black appears to argue that the factual dispute as to what occurred during the March 30 Incident supports a genuine factual dispute as to whether her firing was pretextual.  (*See* doc. 43-1 at 19–20).  Black argues that a reasonable jury could conclude that she had the right to defend herself against sexual assault.  (*Id.* at 7–8, 19–20).  Black does not dispute, however, that her actions fall within the Workplace Violence Policy; she simply argues that her use of violence was justified and thus should have been excused.  But "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).  An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984).  *See also Chapman*, 229 F.3d at 1030 (11th Cir. 2000) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (citation and internal quotation marks omitted).  Black does not point to any evidence indicating that Five Guys factored Black's statements regarding the sexual harassment component of the March 30 Incident into its decision to terminate her.  Without some evidence that Five Guys' invocation of its Workplace Violence Policy "conceals an actual, discriminatory reason," *Brooks*, 446 F.3d at 1163, Black's retaliation claim fails and is due to be dismissed.

### B. State Law Claims

### 1. Count IV – IIED

The Alabama Supreme Court first recognized the tort of outrage, or IIED, in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981). To establish an IIED claim, a plaintiff must show that:

> (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) the distress was severe. *Harris v. McDavid*, 553 So. 2d 567 (Ala. 1989). The conduct alleged must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* at 570; citing *American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1980).

*Shepherd v. Summit Mgmt. Co.*, 726 So. 2d 686, 694 (Ala. Civ. App. 1998).

> The determination as to whether "evidence is sufficiently extreme or outrageous to support a cause of action for outrageous conduct is for the trial court to make as a matter of law." *Carter v. Harris*, 64 F. Supp. 2d 1182, 1194 (M.D. Ala. 1999) (granting summary judgment on outrage claim). In analyzing whether conduct is sufficiently extreme and outrageous to support a claim of outrage, the Court must be mindful that outrage is a very limited cause of action. *See, e.g., Thomas*, 624 So. 2d at 1044. The Alabama Supreme Court has found that a jury question exists in only three types of cases: (1) those involving wrongful conduct with regard to family burials; (2) those involving barbaric methods employed to coerce an insurance settlement; and (3) those involving egregious sexual harassment. *See, e.g., Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (nurse failed to establish jury question on outrage claim against her employer and former supervisor despite having suffered emotional and physical distress when accused publicly of being a drug addict, thief and danger to the public); *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174 (Ala. 1995) (affirming summary judgment on outrage claim where plaintiffs alleged that a "peeping tom" watched them through scratches in their hotel room's bathroom mirror).

*Leeth v. Athens/Limestone Hosp., Inc.*, 2009 WL 10688796, at *2 (N.D. Ala. July 23, 2009) (citing *Hardesty v. CPRM Corp.*, 391 F. Supp. 2d 1067, 1073 (M.D. Ala. 2005)).

Black does not contend that Five Guys itself committed any act that would constitute IIED. (*See* doc. 1 at ¶¶ 35–38). Instead, her theory is that Five Guys is vicariously liable for Rhodes'

conduct.  (*Id.*).  To support vicarious liability under Alabama law, Black must show that (1) the wrongful acts were committed in the line and scope of Rhodes' work for Five Guys; or (2) the acts were committed in furtherance of the business of Five Guys; or (3) Five Guys participated in, authorized, or ratified the wrongful acts. *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995); *see also Potts v. BE&K Cons Walker Dep. Co.*, 604 So. 2d 398, 400 (Ala. 1992) (holding an employer may be "vicariously liable for acts of its employee that were done for the employer's benefit, *i.e.*, acts done in the line and scope of employment or done for the furtherance of the employer's interest").  To show ratification, an employee must show the employer (1) had actual knowledge of the tortious conduct of the offending employee and the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, such conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation.  *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1437 (M.D. Ala. 1998);  *Potts v. BE & K Cons Walker Dep. Co.*, 604 So. 2d 398, 400 (Ala. 1992).

Five Guys denies any of these theories apply.[19]  (Doc. 38 at 25–29).  Black does not address her IIED claim at all in her response.  Thus, she has abandoned it.  *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Bush v. J.P. Morgan Chase Bank, N.A.*,

_____

[19] Five Guys appears to assert this argument as to both of Black's remaining state law claims.  (*See* doc. 38 at 27–29).  Unlike Count IV, Count V appears to assert direct liability for Five Guys' own actions, not vicarious liability for Rhodes' actions.  Five Guys' vicarious liability arguments thus apply only to Count IV.

No. 2:15-CV-00769-JEO, 2016 WL 324993, at *6 (N.D. Ala. Jan. 27, 2016); *Boyd v. Daniels*, No. 2:13-CV-354-MEF, 2014 WL 1245885, at *3 (M.D. Ala. Mar. 24, 2014) (dismissing claims on motion to dismiss for failure to respond); *Joseph ex rel. Joseph v. Allen*, No. CV-13-S-695-NE, 2013 WL 3712334, at *5 (N.D. Ala. July 12, 2013) (dismissing claims on motion to dismiss for failure to respond); *Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (same) (citing *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment)); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").  In any case, Five Guys is correct that sexual harassment is outside the line and scope of Rhodes' employment and not in the furtherance of its interests.  *See East Alabama Behavioral Med., P.C. v. Chancey*, 883 So. 2d 162, 169 (Ala. 2003) ("Alabama courts, as well as other courts, have held that sexual misconduct is personal to the employee and is outside the scope of employment."); *Ex parte Atmore Community Hosp.*, 719 So. 2d 1190 (Ala. 1998) (finding alleged tortfeasor's "alleged conduct was aimed solely at satisfying his own lustful desires," and the defendant was not liable because the conduct alleged did not further its business).  And Black offers no evidence to support that Five Guys ratified Rhodes' conduct.[20]  Accordingly, Black's IIED claim is due to be dismissed.

---

[20] As discussed throughout this opinion, Five Guys was never on notice of Rhodes' conduct until after the March 30 Incident.  Following its brief investigation, Five Guys terminated Rhodes for his physical contact with Black (albeit for violating the Workplace Violence Prevention Policy rather than the Anti-Harassment or Anti-Discrimination Policies).  Under those circumstances, Black's hurdle in showing the third ratification element—that Five Guys failed to remedy the situation—appears insurmountable even if she had attempted to defend her IIED claim.

24

**2. Count V – Negligent/Malicious Retention, Supervision, and Training**

Under Alabama law, when a party seeks to hold an employer liable for the negligent hiring,

training, or supervision of an employee, the following principles apply:

> In the master and servant relationship, the master is held responsible for his
> servant's incompetency when notice or knowledge, either actual or presumed, of
> such unfitness has been brought to him. Liability depends upon its being established
> by affirmative proof that such incompetency was actually known by the master or
> that, had he exercised due and proper diligence, he would have learned that which
> would charge him in the law with such knowledge. It is incumbent on the party
> charging negligence to show it by proper evidence. This may be done by showing
> specific acts of incompetency and bringing them home to the knowledge of the
> master, or by showing them to be of such nature, character, and frequency that the
> master, in the exercise of due care, must have had them brought to his notice. While
> such specific acts of alleged incompetency cannot be shown to prove that the
> servant was negligent in doing or omitting to do the act complained of, it is proper,
> when repeated acts of carelessness and incompetency of a certain character are
> shown on the part of the servant to leave it to the jury whether they would have
> come to his knowledge, had he exercised ordinary care.' "

*Synergies3 Tec Servs., LLC v. Corvo*, 319 So. 3d 1263, 1276–77 (Ala. 2020) (quoting *Lane v.*

*Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983)).

As pleaded in her complaint, Black contends Five Guys "negligent[ly] and/or malicious[ly]

ret[ained], train[ed] and supervis[ed]" Rhodes, McDaniel, and Greene "[b]y failing to have and/or

to enforce a sexual harassment policy and by failing to conduct sexual harassment training,"

ultimately leading to her "retaliatory discharge."[21]  (Doc. 1 at ¶¶ 40–42).  Black also asserts that

---

[21] In her response, Black alters her Count V theories, arguing that Five Guys was negligent
in failing to conduct a background check on Rhodes and by hiring him despite his incomplete job
application.  (Doc. 43-1 at 25–26).  A party may not assert a new theory of liability in a response
to summary judgment.  *Cruz v. Advance Stores Co.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012).
Instead, "[a]t the summary judgment stage, the proper procedure for [a plaintiff] is to amend her
complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint
through argument in a brief opposing summary judgment."  *Gilmour v. Gates, McDonald & Co.*,

Five Guys "negligently and/or maliciously failed to terminate Rhodes after receiving actual notice of his initial sexual harassment of [] Black."  (*Id.* at ¶ 43).   In other words, Black asserts: (1) a theory that Five Guys was negligent through its failure to have a sexual harassment policy in the first place and thus to train Rhodes, McDaniel, and Greene in that (purportedly nonexistent) policy; and (2) a theory that Five Guys failed to enforce its sexual harassment policy by failing to terminate Rhodes after the March 24 Incident.

---

382 F.3d 1312, 1315 (11th Cir. 2004).  Accordingly, the undersigned does not consider Black's newly-asserted theories to be part of her claims in this case.

In addition to Black's procedural hurdle in asserting this new theory, the undersigned also notes that Black cites no authority to support that Five Guys had an obligation under Alabama law to conduct a background check on an unskilled line worker or that it was required to check Rhodes' previous jobs and/or references before it hired him.  Indeed, the Alabama Supreme Court has recently declined to establish that an employer has a duty as a general matter to conduct a background check even upon a third party's request that it "not send . . . any temporary workers with violent criminal backgrounds."  *See Motley v. Express Servs., Inc.*, 386 So. 3d 766, 773 (Ala. June 23, 2023).  And Section 213 of the Restatement (Second) of Agency (which the Alabama Supreme Court has quoted with approval, *see Nw. Mut. Life Ins. Co. v. Sheridan*, 630 So. 2d 384, 389 (Ala. 1993)) rejects such a duty: "One can normally assume that another who offers to perform simple work is competent. If, however, the work is likely to subject third persons to serious risk of great harm, there is a special duty of investigation." Restatement (Second) of Agency § 213 cmt. d.  It would be particularly inapt against this backdrop for a federal court to infer a general duty to investigate under Alabama law.  *Accord Keen v. Miller Env't Grp., Inc.*, 702 F.3d 239, 247 (5th Cir. 2012) (declining "to impose a generalized common law duty to conduct background checks under Mississippi law" given similar state of Mississippi law, including its Supreme Court's adoption of Section 213 of the Restatement).

Further, even if Five Guys had a duty to check Rhodes' previous jobs or references, Black provides no reason to believe that inquiry would have uncovered anything directly disqualifying.  There is no general prohibition—under Alabama law, Five Guys policies, or otherwise—against hiring sex offenders.  While Black claims that Hicks testified "that had he known of Rhodes' conviction for sexual assault he would NOT have hired him" (doc. 43-1 at 23) (citing Hicks Depo. at 12 (43)), the cited portion of the deposition only involves Rhodes' termination.  Hicks did testify that he "would not have hired [Rhodes]" (Hicks Depo. at 6 (19:13)), but, in context, Hicks was simply stating that he was not involved in Rhodes' hiring at all (*see id*. (19:11–13)) ("Q: Do you recall *whether or not* you hired Josh Rhodes? A. I would not have hired him, no.") (emphasis added).

Black's first theory has no evidentiary support at all.  The record contains Five Guys' anti-harassment policy, so it is simply incorrect to state that it did not have one.  There is also no apparent evidence to support that Rhodes, McDaniel, or Greene failed to receive Five Guys' anti-discrimination and harassment training.  Instead, the only evidence in the record concerning this training is evidence that *Black* did not receive it.  Even if Black's first theory was otherwise legally viable, the absence of evidence of its core premise dooms it from the start.

As to Five Guys' enforcement of the sexual harassment policy, Five Guys is correct that there is no evidence to support that it knew sexual harassment was at issue until after the March 30 Incident.  (*See* doc. 38 at 28–29; doc. 45 at 15).  At that point, all of Rhodes' conduct had occurred.  In other words, not only can Black not show "repeated acts of carelessness and incompetency" brought to Five Guys' attention, *Corvo*, 319 So. 3d at 1277, she cannot show *any* acts that were brought to Five Guys' attention prior to the last action that harmed Black.  Black contends that Five Guys wrongfully failed to terminate Rhodes after the March 24 Incident, but, as discussed previously, Black never informed Five Guys of any of the details of this incident until after the March 30 Incident.  Black's March 24, 2021 text messages included no detail beyond that she felt uncomfortable, and her meeting with McDaniel only added that Rhodes had made a comment about her jeans.  Black cannot hold Five Guys liable for failing to terminate Rhodes for sexually harassing her when Five Guys was not on notice that he had done so.  Thus, Black's second theory cannot save her negligent retention, supervision, and training count.

## IV. Conclusion

For the reasons stated above, Five Guys' motion for summary judgment is **GRANTED**.  A separate order will be entered.

DONE this 3rd day of September, 2024.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE